878 F.2d 383
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Solomon SIMMONS, Defendant-Appellant.
 No. 88-3422.
 United States Court of Appeals, Sixth Circuit.
 June 9, 1989.
 
 Before ENGEL, Chief Judge, BOGGS, Circuit Judge, and COHN, District Judge.*
 PER CURIAM.
 
 
 1
 Simmons appeals his convictions on three counts of knowingly and intentionally distributing marijuana in violation of 21 U.S.C. Sec. 841(a)(1). On September 9, 1987, a grand jury indicted Simmons for these violations, and on September 11, 1987, Simmons pled not guilty to all counts. The trial judge restricted cross-examination into a prior minor misdemeanor drug conviction of a government witness, allegedly depriving Simmons of his sixth amendment right to confrontation. We affirm.
 
 
 2
 * The jury trial began on January 11, 1988. The government established that Solomon Simmons distributed marijuana to an undercover agent on two occasions. The defense contended that the government entrapped Simmons into making the distribution.
 
 
 3
 On January 13, 1988, the jury found Simmons guilty of all counts of the indictment. The trial judge sentenced him to the custody of the Bureau of Prisons for two years followed by a two-year period of supervised release for each count. All three sentences are to be served concurrently.
 
 
 4
 John Wascak, a postal service inspector for the United States Post Office, supervised an undercover operation in the Akron Post Office. The investigation began in 1986. Wascak said that the Postal Service had received complaints that the employees in the Akron office were using narcotics. The Postal Service hired Gibson as an undercover agent. Gibson had worked for various agencies of the government in prior investigations. He took a position as a floor worker in the Akron office. He received the same salary that was normally paid to people working in that position. In addition, the Postal Service paid for his apartment, $100 per week for the use of Gibson's car, and an additional $400 per week. Specifically, he received $150 in connection with the particular investigation relating to Simmons.
 
 
 5
 Gibson made three purchases of marijuana from Simmons. Each time, the transaction was taped (it is not clear whether these were audio or video tapes). Gibson testified that he worked in the Postal Service as a mail handler, and told his co-workers that he had transferred to Akron from Miami because his mother was very ill. When Gibson related this to Simmons during their first meeting, Simmons responded that Miami was where one could get "good coke." Gibson met Simmons about a week and one-half after starting work in Akron. Gibson told Simmons that he might be looking for some cocaine in Ohio. Simmons allegedly told Gibson that he had some connections.
 
 
 6
 The two men further discussed their interest in drugs. Gibson explained to Simmons that he smoked cocaine but stayed away from marijuana. Simmons responded that he liked cocaine also. Gibson told Simmons that he intended to sell the drugs he got through Simmons.
 
 
 7
 About a week later, Simmons approached Gibson and told him that he might be able to get some cocaine. Further negotiations for crack over the next month fell through. No transaction for cocaine came to fruition. Simmons told Gibson that his cocaine supplier had been "busted," but that his "reefer" connections were available. Gibson responded that he had friends in his apartment building who were transacting in marijuana and he would see if they were interested in buying any marijuana.
 
 
 8
 The two men eventually agreed on a sale of a small amount of marijuana, one-half ounce for $60. The sale took place in the parking lot of the Akron Main Post Office where it was taped and monitored by Inspector Wascak. The tape of that conversation was played to the jury. Two subsequent "buys" were of a larger nature. Simmons himself allegedly made only ten dollars profit on all three deals together, and claims that Gibson persuaded him to find the marijuana. Allegedly, the ten dollars was for gasoline money. Gibson allegedly told Simmons two hours before the second transaction that the marijuana was "moving fast, selling like firewood." This sale also took place in the parking lot of the Akron Post Office and was taped and monitored by Wascek. That tape was also played to the jury. During that transaction, Simmons told Gibson that he could sell Gibson a quarter pound of marijuana for approximately $350.
 
 
 9
 The third sale took place on April 7th or 8th, when Gibson and Simmons walked out of the Postal building and Gibson pointed to a third person, allegedly a friend from his apartment building, but actually Postal Inspector Truskowski. Truskowski gave Gibson $600, and Gibson gave it to Simmons. They agreed to meet later for the transfer of the marijuana. That afternoon, Gibson and Truskowski met Simmons at the post office and followed Simmons a block, where Simmons gave Gibson approximately six ounces of marijuana. A tape of that transaction also was played to the jury.
 
 
 10
 Simmon's version of events differs from the above. According to Simmons, Gibson did not begin to talk about drugs when he first started working at the Post Office; however, he often talked about how ill his mother was, and that his car needed expensive repairs. He also stated that he needed money to support his habit of alcohol consumption. Gibson often spoke of "getting high" on drugs, and at one point stated that someone had "ripped him off" of cocaine and he needed to "make the money up." After constant complaints about Gibson's financial predicament, Simmons agreed to act as a go-between for Gibson and a friend, "Norman." Gibson said that he needed the marijuana to "mellow out."
 
 
 11
 After the first exchange, Gibson pressed Simmons for more, claiming that he had made a significant amount of money on the first sale. Simmons subsequently facilitated two additional sales of marijuana to Gibson.
 
 
 12
 The defense discovered that Gibson had previously been convicted for a misdemeanor possession of marijuana while he was working as an undercover agent for the Postal Service. At trial, Gibson explained his financial arrangement with the Postal Service, and admitted telling Simmons that he was going to sell whatever drugs he obtained. Defense counsel questioned Gibson as to whether he used marijuana. Gibson testified that he did not presently, nor had he ever used it. The trial judge refused to allow any defense questions regarding Gibson's prior misdemeanor conviction. Defense counsel requested a voir dire of Gibson out of the presence of the jury concerning the prior criminal conviction. The court granted the request.
 
 
 13
 During the voir dire, the defense counsel questioned Gibson about his prior criminal history. He did not ask Gibson any questions about his denial that he had used marijuana or about any inconsistency between that denial and the possession conviction. The prosecution notes that defense counsel did not suggest the argument now raised on appeal during the voir dire or at any later time at trial. Defense counsel subsequently moved for a mistrial on the ground that Gibson's "rap sheet" should have been given to him earlier so that he could have investigated certain matters listed on it.
 
 
 14
 Simmons testified at the trial and admitted distributing the marijuana to Gibson on the three occasions charged in the indictment. Simmons also had a prior conviction for possession of marijuana with intent to distribute. However, Simmons asserted the defense of entrapment against the present charges, and claimed that he and Gibson had become close friends working the same shift during their first month at the post office together, and that Gibson was continually "pestering" him to find him drugs. Simmons further admitted that he knew he was committing a crime by getting the drugs for Gibson, and that he knew that Gibson intended to resell the marijuana. The government then introduced evidence that showed that Simmons and Gibson did not work the same shift until May 1987.
 
 II
 
 15
 On appeal, Simmons argues that the introduction of evidence regarding Gibson's prior misdemeanor conviction for possession of marijuana was permissible under Fed.R.Evid. 608(b), and that the prior conviction for possession of marijuana would have been quite pertinent to Gibson's credibility; however, defense counsel was not allowed to bring the earlier conviction to the jury's attention. The government claims that there was no error in the trial court's failure to admit evidence relating to a minor misdemeanor drug offense, first, because it was not raised during or after the voir dire; and second because the possession conviction does not prove that Gibson was lying when he stated that he had never used marijuana.
 
 
 16
 A trial judge's decision regarding an evidentiary or testimonial issue will not be disturbed absent an abuse of discretion. Davis v. Alaska, 415 U.S. 308, 316 (1974); United States v. Pritchett, 699 F.2d 317, 321 (6th Cir.1983) (citing Davis, 315 U.S. at 316; United States v. LaRiche, 549 F.2d 1088 (6th Cir.), cert. denied, 430 U.S. 987 (1977)). With this in mind, we proceed to an analysis of Simmons's claims.
 
 Fed.R.Evid. 608 states:
 
 17
 (a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.
 
 
 18
 (b) Specific instances of conduct. Specific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
 
 
 19
 The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the accused's or the witness' privilege against self-incrimination when examined with respect to matters which relate only to credibility.
 
 
 20
 The defense asserts that Rule 608(b) would allow the introduction of this evidence to attack Gibson's credibility. Their claim is that Gibson was a principal witness, and that, if the court found that the probative value of the evidence of Gibson's prior conviction outweighed the prejudicial effect, the defense should have been allowed to use that evidence on cross-examination to attack Gibson's credibility.
 
 
 21
 It is true that Gibson testified that he had never used marijuana, and that, in fact, he had a prior misdemeanor conviction for possession of marijuana. The court would not permit the defense to question Gibson about his prior criminal history in open court. However, defense counsel questioned Gibson during a voir dire conducted for that purpose, out of the hearing of the jury, during which defense counsel never once questioned Gibson about the prior conviction. Instead, subsequently, defense counsel moved for a mistrial on the ground that Gibson's "rap sheet" should have been given to him at an earlier stage of the proceedings.
 
 
 22
 The prosecution argues that this issue may not be raised now because it was not raised in an earlier stage in the proceedings. We agree. The well-settled rule is that reversal of a conviction will not be had based on grounds not raised in the district court. United States v. McDowell Contractors, Inc., 668 F.2d 256, 257 (6th Cir.1982); United States v. Hoye, 548 F.2d 1271, 1273 (6th Cir.1977). We know of no authority to the contrary. If Simmons's defense counsel had not had the opportunity to question Gibson during the voir dire about the contradiction between his prior conviction and his testimony, this might be a very different case. However, in the present case, because the defense had ample opportunity during voir dire to raise the issue of the use of Gibson's prior conviction as impeachment evidence and did not, the defense should not benefit from its own omission.
 
 
 23
 Therefore, we AFFIRM the judgment of the district court.
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation